UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

Laurie A. Beck, as Personal
Representative of the Estate of
Raymond Lavere Beck, Jr.,

                           Plaintiff,

        v.

KEMET Corporation Deferred
Compensation Plan for Key Managers,

                           Defendant.

C/A No. 6:04-22632-GRA

ORDER
(Written Opinion)

        This matter comes before the Court upon Plaintiff's complaint against KEMET

Corporation Deferred Compensation Plan for Key Managers (the "Plan") seeking

additional benefits under the Plan governed by the Employee Retirement Income

Security Act of 1974, 29 U.S.C. § 1001 *et seq*. ("ERISA").  Plaintiff complains that

the Plan Administrator miscalculated benefits due under the Plan.  A hearing was held

before this Court on January 13, 2005.  After considering the evidence submitted by

the parties, the Court makes the following findings of fact and conclusions of law

pursuant to Federal Rule of Civil Procedure 52.

## FINDINGS OF FACT

1.    Raymond Lavere Beck, Jr. ("Mr. Beck") was an employee of KEMET Corporation

("KEMET"), employed as Executive Vice-President for Marketing, and a participant in

1

the Plan.[1]

2.      The Plan provided a supplemental executive retirement benefit ("SERP benefit") to selected highly compensated members of KEMET's management.  Article 1.8 of the Plan set forth the purpose of the SERP benefit, which was designed to equal to the difference between (a) the benefit a participant would have accrued under the Retirement Program Plan for Employees at KEMET Electronics Corporation and its Participating Subsidiary Companies, a defined benefit plan sponsored by KEMET (the "Retirement Plan") if the compensation limits and annual addition limits of Internal Revenue Code Sections 401(a)(17) and 415 did not exist and (b) the benefit the participant actually accrued under the Retirement Plan.

3.      Administration of the Plan was governed by Article 7.1:

> The Committee shall be responsible for the administration and interpretation of the Plan, shall act as the Plan Administrator and shall have all powers necessary to enable it to carry out its duties in the administration and interpretation of the Plan, and shall have the duty and power to determine, in the exercise of its sole and absolute discretion, all questions that may arise hereunder as to the status and rights of Participants and Beneficiaries in the Plan and as to the right of any individual to a benefit.

4.      The Committee itself was not actually named in the Plan document.  However, since the inception of the Plan, the Plan had been administered by KEMET's Vice-President of Human Resources and Corporate Benefits Manager.  When Mr. Beck brought his claim, the Committee was staffed by Larry McAdams and Jan Pittman.

---

[1]While this case was pending, Mr. Beck died on April 7, 2005.  Upon the motion of Plaintiff's counsel, Laurie Beck, as personal representative of Mr. Beck's estate, was substituted as Plaintiff.

5.      Article 9 of the Plan provides for a claims procedure and review process.  After a claim was filed, the Plan Administrator was required to notify the claimant of its decision with regard to the claim. The claimant was to be given an opportunity to review and submit relevant documents relating to the claim.  The claimant could then seek a review of the decision made by the Plan Administrator.  The decision on review by the Plan Administrator was considered "final and conclusive."

6.      The Plan was made effective January 1, 1995.  There is no evidence that a claim regarding a disputed calculation of a participant's SERP benefits or review of a disputed denial  decision was made under the Plan or submitted to the Plan Administrator prior to Mr. Beck's claim that became the subject of this lawsuit.

7.      Mr. Beck's last day of active employment with KEMET was November 30, 2002. Mr. Beck and KEMET entered into a Separation Agreement dated December 1, 2002 (the "Separation Agreement"), which provided that Mr. Beck resigned from KEMET effective December 1, 2002.

8.      Mr. Beck was born on August 3, 1949. Therefore, at the time of his effective resignation, he was 53 years old.

9.      Article 5.1 provided that benefits under the Plan were to be paid out to a participant "[a]s soon as administratively feasible following the Participant's death, Disability, Retirement or other Termination of Service … in the form of payment selected by the Committee in its sole discretion."  The Plan preamble confirmed that "benefits are normally payable by the Company to the Employees or their beneficiaries

3

upon Retirement, Disability, death or other Termination of Service" (the "SERP Benefit Payment Date").

10.    The Plan defines "Retirement" in Article 1.23 as "Termination of Service, other than on account of death, after attaining age 65."  "Termination of Service" is defined in Article 1.25 as "Termination of the Participant's employment with the Participating Company."  Because Mr. Beck was not 65 at the time he was separated from employment, he was entitled to benefits upon the termination of his employment with KEMET, which was the effective date of his resignation, and therefore, his SERP Benefit Payment Date was December 1, 2002.[2]

11.    The Plan does not provide a precise methodology for making lump-sum calculations of the SERP benefit.  In order to achieve the stated purpose of the Plan, the Plan Administrator, since the inception of the Plan, consistently used several criteria to calculate the SERP benefit.

    a.    First, using the participant's average straight time earnings, the Plan Administrator calculated the difference between the monthly benefit the participant would have earned under the Retirement Plan without the limits imposed by the Internal

---

[2]Pursuant to the Separation Agreement, Mr. Beck received "separation pay" each month for 12 months, with the payments ending on November 30, 2003.  As part of a negotiated separation settlement, Mr. Beck was allowed to continue to participate in KEMET's health and life insurance plans as an active employee until May 30, 2003; he did not receive coverage under these plans as a retiree until June 1, 2003.  Mr. Beck was also allowed to defer payment under the Plan until 2004.  However, none of these dates changed the December 1, 2002 effective date of Mr. Beck's resignation (or "termination of service").  Moreover, Mr. McAdams testified that he consistently determined the SERP Benefit Payment Date as the first day of the month following the last day worked.  Mr. Beck's last day worked was November 30, 2002.

4

Revenue Code ("without caps") and the benefit the participant actually accrued under the Retirement Plan ("with caps") to determine a monthly SERP benefit. If a participant terminated service from KEMET prior to age 62 (when he/she was eligible for benefits under the Retirement Plan), the Plan Administrator employed a "reduction factor" factoring in the difference between the SERP Benefit Payment Date and the date the participant turned 62 in the calculation of the monthly SERP benefit, which reflected that payments began prior to normal retirement (age 62).[3]

b.     Second, the Plan Administrator assumed, for purposes of a lump sum calculation, that the participant had a life expectancy of 80 and therefore calculated the date on which the participant turned 80.[4]

c.     Third, the Plan Administrator calculated the number of months between the SERP Benefit Payment Date and the date on which the participant turned 80.

d.     Fourth, the Plan Administrator multiplied the total number of months by the monthly SERP benefit.

e.     Finally, the Plan Administrator calculated the present value of the accrued benefits, reflecting that the SERP benefit was paid out in lump sum instead of making

---

[3]The Plan document indicates that a "Deferral Account," a separate bookkeeping account, would be kept relating to each participant that would include the SERP benefit. No such account was maintained for any Plan participant. Mr. Beck testified that to maintain such "Deferral Accounts" would have been impossible as a practicality because the calculation of the monthly SERP benefit, as described above, could only be performed as of the SERP Benefit Payment Date.

[4]The Plan was amended in 2002 to employ mortality tables instead of assuming a life expectancy of 80. However, the Amendment was expressly "effective only with respect to Participants who terminate employment with KEMET .... after December 31, 2002." Mr. Beck's employment was terminated prior to the effective date of this Amendment. Therefore, the Plan Administrator used the prior methodology and did not use the mortality table.

monthly payments over a period of years. To determine the present value discount rate for the SERP benefit, the Plan Administrator adopted the discount rate used by the Retirement Plan trust fund at the time of the SERP Benefit Payment Date.[5] The discount rate for the Retirement Plan trust fund was determined by an external actuary who would perform the actuarial calculations to determine what the necessary funding rate or discount rate should be to make sure that the Retirement Plan met the minimum or funding level required by law.

12.    In large part, it appears that the Plan Administrators followed this same methodology to calculate SERP benefits for every eligible participant since the inception of the Plan through the time that Mr. Beck made his claim. Mr. McAdams and Ms. Pittman followed the same methodology established by their predecessors in calculating Mr. Beck's SERP benefits. Other than applying Plan amendments that were inapplicable to Mr. Beck's claim for SERP benefits, Mr. McAdams and Ms. Pittman followed the same methodology for SERP benefit claims under the Plan subsequent to Mr. Beck's claim. There is no evidence that Mr. Beck was singled out or treated differently from other participants who were eligible to receive benefits under the Plan.

13.    Using this methodology, the Plan Administrator determined that Mr. Beck's monthly SERP benefit was $2,711.16, that his SERP Benefit Payment Date was

---

[5]The Retirement Plan trust fund discount rate was used until the Plan was terminated in 2004, at which time the Plan was expressly amended to reflect that the present value of accrued benefits under the Plan should be calculated using an annual interest rate of 5.12%. Because Mr. Beck's SERP Benefit Payment Date pre-dated the termination of the Plan, this Amendment did not apply to the calculation of his benefits.

December 1, 2002, and that the number of months between the SERP Benefit Payment Date until he attained the age of 80 was 321. Using a discount rate of 7%, the discount rate used by the Retirement Plan at the time of the SERP Benefit Payment Date, the Plan Administrator determined that Mr. Beck was entitled to a lump sum SERP payment of $395,219.00.[6]   The methodology used to calculate Mr. Beck's benefits was consistent with prior estimations that the Plan Administrator provided to Mr. Beck, including an estimate provided to Mr. Beck at the time of his termination of employment from KEMET. The methodology was consistent with benefit guides published to Mr. Beck and others at KEMET.   There is no evidence that Mr. Beck was ever told or promised that his benefits would be calculated in a manner different from the way in which the Plan Administrator calculated his benefits.

14.    The Plan Administrator, as it did with other participants in the Plan, permitted Mr. Beck to defer payment of the SERP benefit for tax purposes.   Mr. Beck elected to defer payment of the SERP benefit until the first quarter of 2004.

15.    Upon receiving the benefit, Mr. Beck filed a claim under the Plan with the Plan Administrator on March 4, 2004. He complained that the Plan Administrator used the wrong "reduction rate" to determine the SERP monthly benefit, arguing that the date he received the benefits should be used instead of the SERP Benefit Payment Date. He

---

[6]The Plan Administrator initially miscalculated Mr. Beck's average straight time earnings and determined that Mr. Beck's monthly SERP benefit was $2,660.18. However, once this error was brought to the Plan Administrator's attention, the error was rectified, and Mr. Beck received a check in the amount of $395,219.00.

also took issue with the life expectancy age and the present value discount rate.

16.    On June 15, 2004, the Plan Administrator, through Mr. McAdams, responded

to Mr. Beck.  In pertinent part, the Plan Administrator stated:

> The intent of the [SERP benefit] was to create a non-qualified retirement
> plan for executives that supplemented the potential pension payment from
> the [Retirement Plan] due to statutory imposed limitations on annual earning
> limits.  It was also the intent of the plan to pay this distribution out in a
> lump sum amount when the Executive left the employment of the
> corporation for any reason, whether or not they met the eligibility
> requirements to retire from the corporation. The plan document calls for a
> total distribution of the recipients SERP balance at termination using current
> age, service, FAE (Final Average Earnings), and the interest rate assumption
> used in the [Retirement Plan] at the time of separation from active service
> from the company.  Over the years it became company practice to allow the
> departing Executive to elect deferral of the payment into the first quarter of
> the following year in which they last received salary compensation. This
> was done primarily to afford the Executive some tax relief as the SERP
> distribution became immediately taxable as income upon receipt.  There
> never has been any intent or actual practice to change the criteria used to
> calculate the amount of the SERP payment from the date of termination
> versus the date of actual distribution.

The letter addressed Mr. Beck's arguments and upheld the benefit calculation

methodology that employed the reduction factor at the time of termination, the life

expectancy assumption, and the present value reduction rate.

17.    On August 10, 2004, Mr. Beck sought a review of the calculation decision.  In

support of his claim, he submitted the Plan document; a benefits "Binder" dated July

1997 (the "Binder") published by KEMET that addressed, among other things, certain

aspects of the SERP benefit; his correspondence with the Plan Administrator Committee

members; his own calculations of how the benefits should be calculated; and a life

expectancy table published by the Internal Revenue Service. In short, Mr. Beck

8

submitted that the age reduction factor should be calculated at the time he received the

benefit, not at the time of his separation of employment; that the lump sum calculation

should be based upon the Table I of IRS Publication 590 life expectancy table instead

of age 80; and that the present value discount rate of 7% was too high.

18.     On September 10, 2004, the Plan Administrator issued its final decision and

upheld the methodology used to calculate Mr. Beck's SERP benefit.  In pertinent part,

the letter provided:

> In general, your appeal is based on the assertion that your benefits should
> be determined as of September 1, 2004 or some other date after the date
> of your termination of employment with KEMET.  As provided in Section
> 1.8 of the Plan, however, a Plan participant's SERP benefit is calculated
> based on the participant's accrued benefit under the Retirement Program
> Plan for Employees of Kemet Electronics Corporation and its Participating
> Subsidiary Companies (the "Retirement Plan").  As indicated in Section 1.1
> of the Retirement Plan, accrued benefits under the Retirement Plan for
> individuals who terminate service with KEMET prior to their Normal
> Retirement Date (as defined in the Retirement Plan) are calculated "as of the
> date of termination of employment."  The Plan thus requires that SERP
> benefits be determined as of the date of termination of employment,
> regardless of when the payment of benefits may actually occur.  Your
> termination of employment was November 30, 2002 for purposes of
> determining your benefits under the Retirement Plan.
>
> In calculating the SERP benefits, the reduction factor for determining the
> amount of any early reduced monthly benefit must be applied based on the
> participant's age as of the date of termination of employment because SERP
> benefits are not only calculated but also payable upon termination of
> employment (see Section 5.1 of the Plan).
>
> With respect to life expectancy, your benefits were calculated using the life
> expectancy tables used by the Plan at the date of your termination of
> service.  The Plan has since been amended to adopt new life expectancy
> tables, however, the amendment by its terms only applies to individuals
> who terminated service with KEMET after December 31, 2002. The life
> expectancy tables in IRS Publication 590 are for use in determining required

9

minimum distributions for an individual retirement account (IRA).  These tables are not relevant to the Plan as the Plan is obviously not an IRA and nonqualified deferred compensation plans are not required to make required minimum distributions.

With respect to the discount rate used, SERP benefits are determined as of the date of termination of employment so the appropriate discount rate is the applicable rate at such time.  Because SERP benefits are determined based on accrued benefits under the Retirement Plan, it is entirely logical, reasonable and appropriate for the Plan Administrator to use the discount rate in effect at the time for the Retirement Plan.

19.    Having exhausted his administrative remedies, and having had a sufficient opportunity to raise issues, make arguments, and provide documents in support of his claim, Mr. Beck brought the lawsuit at hand.

20.    The methodology used by the Plan Administrator in administering Mr. Beck's claims was the same as that used for other participants prior to Mr. Beck's claim.

21.    The parties agree that the Plan is governed by ERISA, and Plaintiff's sole cause of action in the Complaint is an action for benefits under ERISA, 29 U.S.C. § 1132. Consequently, Plaintiff's remedies are limited to that which is provided in ERISA.

## **CONCLUSION OF LAW**

*A.    The ERISA Top Hat Plan*

While the Plan is an employee pension benefit plan governed under ERISA, ERISA § 3 (2), 29 U.S.C. § 1002(2), it should be considered a "top hat" plan because it is an unfunded plan that is "maintained by an employer for a select group of management or highly compensated employees."  29 C.F.R. § 2520.104-23(a).  Language in the Plan document meets the top hat plan qualifications contained in ERISA regulation

10

requirements: the Plan was maintained by KEMET for "the purpose of providing deferred compensation for a select group of management or highly compensated employees" and for which benefits are "paid as needed solely from the general assets of the employer." *See id.* at 2520.104-23(d); Plan at Preamble, Article 10.2.[7] Plans that meet the top hat plan requirements are expressly exempt from ERISA's participation, vesting, funding, and fiduciary requirements. *See, e.g.*, ERISA §§ 201 (2), 301(a)(3), 401(a)(1) (29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1)); *see also* 29 C.F.R. § 2520.104-23(a).  In explaining why Congress deliberately chose to exclude executives and highly compensated employees from the substantive protections of ERISA, the Department of Labor stated:

> [I]n providing relief for "top-hat" plans from the broad remedial provisions of ERISA, Congress recognized that certain individuals, by virtue of their position or compensation level, have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their deferred compensation plan, taking into consideration any risks attendant thereto, and, therefore, would not need the substantive rights and protections of Title I.

DOL Office of Pension & Welfare Benefit Programs, Opinion 90-14 A, 1990 WL 123933 (May 8, 1990); *see also Denzler v. Questech, Inc.*, 80 F.3d 97, 100 n.1 (4th Cir. 1996) ("Many ERISA rules and protections that apply to funded pension benefits plans, including detailed accrual, vesting, funding, and fiduciary responsibility regulations, do not apply to Top Hat plans.").  The enforcement provisions of ERISA

---

[7]The Binder's language regarding the purpose and goal of the Plan also confirms that the Plan's purpose was to meet the ERISA statutory and regulatory guidelines to be a top hat plan.

described in ERISA § 502(a), 29 U.S.C. § 1132(a), however, apply to top hat plans. *Denzler*, 80 F.3d at 100 n.1.

B.    *Determining the Standard of Review*

When an ERISA benefit plan gives the administrator discretionary authority to determine eligibility for benefits or to interpret terms of the plan, the Court should apply an abuse of  discretion standard to determine if the plan administrator's decision was reasonable. *See, e.g.*, *Booth v. Wal-Mart Stores, Inc*., 201 F.3d 335, 342 (4th Cir. 2000) ("Accordingly, we repeat that the standard for review under ERISA of a fiduciary's discretionary decision is for abuse of discretion, and we will not disturb such a decision if it is reasonable."); *see also Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  The Plan bestows upon the Plan Administrator broad discretion to interpret Plan provisions.    Article 7.1 of the Plan specifically gives the Plan Administrator "the duty and power to determine, in the exercise of its sole and absolute discretion, all questions that may arise hereunder as to the status and rights of Participants and Beneficiaries in the Plan and as to the right of any individual to a benefit."  There is no ambiguity to this language: the Plan gives the administrator sole discretionary authority to construe the terms of the Plan and determine whether Mr. Beck was eligible for Plan benefits.

Consequently, this Court is to apply the abuse of discretion standard.    *See Booth*, 201 F.3d at 344 ("Accordingly, we conclude that the Plan in this case provides its administrator with discretion to interpret Plan language and to grant or deny benefits

12

in accordance with these interpretations, but we will enforce the administrator's decisions only if they are reasonable...."); *see also Elliott v. Sara Lee Corp.*, 190 F.3d 601, 605 (4th Cir. 1999) ("If the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan, a reviewing court may reverse the denial of benefits only upon a finding of abuse of discretion.") (internal quotations omitted).  Under an abuse of discretion standard, "the administrator or fiduciary's decision will not be disturbed if it is reasonable, even if this court would have come to a different conclusion independently." *Ellis v. Met. Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997).  The administrator's decision "is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Id*. (internal quotations omitted).

A self-funded or self-administered plan has the potential to create a conflict of interest when plan fiduciaries have ties to a plan's contributor. *Adams v. Louisiana-Pacific Corp.*, 284 F.Supp.2d 331, 337 (W.D.N.C. 2003) (citing Fourth Circuit authority).  In such cases, the standard of review does not change, but is modified such that the Court may "lessen the deference normally given under this standard of review ... to the extent necessary to counteract any influence unduly resulting from the conflict." *Bynum v. Cigna Healthcare of North Carolina, Inc*., 287 F.3d 305, 312 (4th Cir. 2002).  Under this modified abuse of discretion standard of review, the Court is required to review the merits of the Plan Administrator's

interpretation to determine whether it is consistent with the exercise of discretion by a fiduciary acting free of a conflict of interest.  *Smith v. Continental Cas. Co.*, 369 F.3d 412, 417-18 (4th Cir. 2004).

> *In no case does the court deviate from the abuse of discretion standard*. Instead, the court modifies that abuse of discretion standard according to a sliding scale.  The more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence must be to support it.

Id. at 418 (emphasis added); *see also Mitchell v. Fortis Benefits Ins. Co.*, 2005 U.S. App. LEXIS 15693 at *12-13 (4th Cir. July 29, 2005) (echoing and applying this standard).

In the case at hand, the Plan Administrator is employed by the Plan contributor, which presumably has a financial stake in the outcome of Mr. Beck's claim, and thus could trigger the modified abuse of discretion standard of review.  However, the Fourth Circuit has made clear that these facts are not sufficient to arise to a conflict of interest that warrants application of the less deferential modified abuse of discretion standard of review.  *See Colucci v. Agfa Corp.*, 431 F.3d 170 (4th Cir. 2005).

> [T]he simple and commonplace fact that a plan's administrator is also its funder is not enough to support a finding of a conflict of interest that would cause an adjustment to our deference.  The circumstances under which we have suggested a conflict of interest might arise are when a plan is managed by its insurer, whose revenue comes from fixed premiums paid by the plan's sponsor. In such a case, we were willing to assume that the insurer-administrator's profit motives unavoidably factored into its decisions to accept or deny plan members' claims . . .
>
> There is a material difference . . . between a corporation whose

14

business profits primarily derive from managing ERISA plans and a corporation that collaterally manages a plan through which it chooses to provide its employees with benefits. We question how a company that creates, funds, and administers a plan for its own employees' benefit can, from those facts alone, be presumed to have a financial conflict in administering that plan when the company remains free to end the plan altogether. The company's business plan could not be dependent on its denying benefits . . . because it could decide to deny all benefits simply by ending the plan should the benefits become too burdensome. When a company sponsors a plan and then administers it, the fact that the benefits cost money is insufficient to support the presumption of a conflict; that cost is the product of its election to provide the employees with benefits.

Id. at 179.  Furthermore, the fact that the Plan sponsor did not hire independent employees to administer the plan does not support the presumption of a conflict of interest.  *See id.* at 180.  More must be shown, for instance, that the Plan "administrator was closely aligned with the plan sponsor's leadership [and] relied on biased information provided by the plan's sponsor." *Id*. (citing *Johannsen v. District No. 1 1-Pac. Coast Dist., MEPA Pension Plan*, 292 F.3d 159, 176-77 (4th Cir. 2002)). There is no evidence to demonstrate that the Plan Administrator was either closely aligned with the Plan sponsor's leadership or that the Plan Administrator relied on biased information provided by the Plan's sponsor.  Therefore, the Court will review the Plan Administrator's decision in this case for abuse of discretion and will uphold the decision  if it is objectively reasonable and supported by substantial evidence.

C.     *Evaluation of the Plan Administrator's Decision*

Using the standard of review set out by the Fourth Circuit, this Court will consider the process by which the Plan Administrator arrived at its decision to deny additional benefits to Mr. Beck.  The dispute in this lawsuit centers on the calculation

15

of Mr. Beck's benefits under the Plan.  Plaintiff argues, as Mr. Beck did before the Plan

Administrator, that the Plan Administrator made three "erroneous assumptions" in

calculating his benefits concerning his "retirement date," the present value discount

rate, and his life expectancy.  The Plan Administrator responded to each of these

arguments in detail in the review of Mr. Beck's claim.  The sole issue before the Court

is whether that decision by the Plan Administrator was reasonably supported by

substantial evidence.

In order to evaluate the decision by the Plan Administrator, the Court may review

several factors, including:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the
> adequacy of the materials considered to make the decision and the degree
> to which they support it; (4) whether the fiduciary's interpretation was
> consistent with other provisions in the plan and with earlier interpretations
> of the plan; (5) whether the decisionmaking process was reasoned and
> principled; (6) whether the decision was consistent with the procedural and
> substantive requirements of ERISA; (7) any external standard relevant to
> the exercise of discretion; and (8) the fiduciary's motives and any conflict
> of interest it may have.

*Booth v. Wal-Mart Stores, Inc.*, 201 F.3d 335, 342-43 (4th Cir. 2000).  An evaluation

of the steps taken by the Plan Administrator – giving the Plan Administrator deference

to its interpretation of the Plan – demonstrates that the decision is supported by

substantial evidence and engaged in a principled process in arriving at the decision.

1.    *Plan Language*

With regard to the SERP Benefit Payment Date, the Plan language is clear.  The

triggering event for Mr. Beck's receipt of SERP benefits under the Plan was not

retirement, death, or disability, but his "termination of service" (resignation) from KEMET.  Benefits are "normally payable upon" the triggering event.  Benefits under the Plan were thus "payable" to Mr. Beck on or about December 1, 2002. The Plan language supports the Plan Administrator's interpretation that the SERP Benefit Payment Date – the date on which the benefits are payable – is the appropriate date to calculate the amount of the benefits due to Mr. Beck, even if Mr. Beck elected to defer the actual payment of the benefit.

As to calculating the amount of the benefit to be paid, Article 1.8 sets forth the SERP benefit available to Plan participants:

> With respect to a Participant, an amount equal to the *lump sum value* of the difference between (a) the benefit that the Participant would have accrued under the Retirement Plan had…there been disregarded the compensation and annual addition limitations of §§ 401(a)(17) and 415 of the Code and the corresponding provisions of the Retirement Plan, and (b) the benefit that the Participant actually accrued under the Retirement Plan.

(*emphasis added*).

Unfortunately, the Plan does not set forth a precise methodology for determining the lump sum value.  At the time of Mr. Beck's claim, there was no express Plan language providing that the Plan Administrator was to use 80 as a participant's life expectancy or the precise calculation of the present value reduction rate.  For these particular calculations, the Plan language provides no direct assistance.  However, Article 7.1 of the Plan does explicitly give the Plan Administrator the authority to interpret the Plan, and the "duty and power to determine, in the exercise of its sole and absolute discretion, all questions that may arise hereunder as to the status and rights

17

of Participants and Beneficiaries in the Plan and as to the right of any individual to a benefit." Clearly, the Plan Administrator had the authority and discretion to determine calculation methodology. While it might have been better had the Plan Administrator published its methodology rules pursuant to Article 7.3, its failure to do so does not subvert its authority to determine the rights of individuals to benefits under the Plan.

2.    *The Purposes and Goals of the Plan*

The Preamble and Article 1.8 succinctly set forth the purposes and goals of the Plan. Both parties agree that the purpose of the SERP benefit was to create a non-qualified retirement plan for executives that supplemented the potential pension payment from the Retirement Plan due to statutory imposed limitations on annual earning limits. It was also the intent of the Plan to pay this distribution out in a lump sum amount when the participants left the employment of the corporation for any reason, whether or not they met the eligibility requirements to retire from KEMET. While Mr. Beck provided an alternative calculation, the methodology and calculations used by the Plan Administrator do not frustrate the purposes and goals of the Plan. Accordingly, this factor does not weigh against a finding that the Plan Administrator's methodology was reasonable.

3.    *The Adequacy of the Materials Considered to Make the Decision*

The record demonstrates that the Plan Administrator considered, among other things, the Plan document, the Retirement Plan document and discount rates, and the documents submitted by Mr. Beck during the claim and review of the claim. However,

the Plan Administrator's decision was primarily motivated by the long-held understanding of how the SERP benefits were to be and had been calculated under the Plan, and the fact that the Plan had consistently estimated and actually paid the SERP benefits and calculated Mr. Beck's benefits in accordance with that understanding.  The record clearly indicates that Mr. Beck's benefits were calculated using the methodology employed by all prior claims for SERP benefits under the Plan.

The Plan Administrator did not make its decision arbitrarily or capriciously.  Upon receiving Mr. Beck's request for a review of its initial denial decision, the Plan Administrator called its attorney to review its calculation methodology.  Each of the standards used by the Plan Administrator were objectively reasonable, accessible to Participants (because they could and did receive calculation estimates during their employment with KEMET), and disclosed to Mr. Beck.  For example, to determine the present value discount rate for the SERP benefit, the Plan Administrator adopted the discount rate used by the Retirement Plan trust fund at the time of the SERP Benefit Payment Date.  Because the SERP benefit was based on benefits accrued under the Retirement Plan, using the Retirement Plan discount rate was reasonable.  Moreover, the discount rate for the Retirement Plan trust fund was determined by an external actuary who would perform the actuarial calculations to determine what the necessary funding rate or discount rate should be to make sure that the Retirement Plan met the minimum or funding level required by law.  This was an objective standard established by an external source.  The Plan Administrator followed the same formula in calculating

Mr. Beck's benefits as had been followed in other claims.

The Plan Administrator also considered the materials submitted by Mr. Beck. The Binder, which did contain a methodology for the SERP benefit calculation, supported the Plan Administrator's decision. The Plan Administrator explained why Mr. Beck's use of a randomly selected I.R.S. mortality table was not relevant to this particular analysis. Consequently, the materials used by the Plan Administrator to make its decision were therefore adequate and supported its methodology.

*4.    Whether the Plan Administrator's Interpretation Was Consistent With Earlier Interpretations of the Plan*

As set forth above, the Plan Administrator clearly interpreted Mr. Beck's claim consistently with earlier claims and calculations of SERP benefits under the Plan. There is no evidence that Mr. Beck's calculations differed in any material respect from any other prior calculations. Mr. Beck's claim appears to be handled like any other claim for SERP benefits under the Plan. While he was employed by KEMET and at the time of his termination, Mr. Beck was given estimates of his SERP benefits using this methodology. He did not object to or complain about the estimates and had no legitimate reason to believe that his SERP benefits would be calculated any differently than that which was estimated. The Plan Administrator simply followed the methodology always used to calculate benefits and employed by prior Plan Administrators. This factor strongly weighs in favor that the Plan Administrator acted reasonably.

*5.    Whether the Decision Making Process Was Reasoned and Principled*

20

When the Plan Administrator received Mr. Beck's claim, it reviewed other similar claims to make sure that Mr. Beck's claim was handled like all other claims for SERP benefits under the Plan. When confronted with evidence that Mr. Beck's average straight time earnings were miscalculated, the Plan Administrator addressed and rectified the error.  Upon receipt of Mr. Beck's request for a review, the Plan Administrator consulted with a lawyer familiar with the Plan.  Mr. Beck had an opportunity to submit documents and evidence in favor of his claim, and this evidence was considered by the Plan Administrator.  The Plan Administrator followed the claims procedures set forth in the Plan and its process was reasoned and principled.

6.    *Consistency with ERISA Requirements*

ERISA § 502, 29 U.S.C. § 1133, requires that plan participants be notified in writing of a benefit denial and be given an opportunity for a full and fair hearing.  As stated previously, the Plan Administrator denied the claim and issued its denial letter to Mr. Beck.  Mr. Beck had a full and fair opportunity to have the denial decision reviewed and did in fact take advantage of that opportunity.  He submitted documents and argument in favor of his claim and position.  The Plan Administrator reviewed these documents and his position before coming to a final decision.  The Plan Administrator issued a final decision in writing and detailed the reasons for the denial.  Therefore, ERISA requirements have been met.

7.    *External Standards Relevant to the Exercise of Discretion*

Other than which has already been cited above, the Court is unaware of any

21

external standards relevant to the methodology used by the Plan Administrator in this case. Therefore, this factor does not weigh for or against a finding that the Plan Administrator's methodology was reasonable.

8.    *Conflict and Motives of the Plan Administrator*

As previously discussed, the fact that the Plan Administrator is employed by the Plan's sponsor is not sufficient to arise to a conflict of interest that warrants application of a less deferential standard of review. *See Colucci v. Agfa Corp.*, 431 F.3d 170, 179-80 (4th Cir. 2005). There is no evidence that the Plan Administrator was closely aligned with the leadership of the Plan's sponsor or relied upon biased information supplied by the Plan's sponsor. Therefore, this factor weighs in favor of a finding that the Plan Administrator's decision was reasonable.

9.    *Summary*

The Plan Administrator engaged in a deliberative process, giving Mr. Beck a full and fair opportunity to present his claim. The Plan Administrator, relying on prior precedent and consistent methodology, determined that it had properly calculated Mr. Beck's SERP benefits under the Plan. While Mr. Beck provided an alternative means to calculate benefits, even supplying his own objective measures, the standard to be applied by the Court is not whether his methodology was better, reasonable or supported by substantial evidence. The standard is whether the Plan Administrator's decision was reasonably supported by substantial evidence. *See Booth*, 201 F.3d at 344 ("Because the administrator was given discretion to make the decisions under

22

review in this case and acted within the scope of this discretion, we will not disturb the administrator's decision if it is reasonable, even if we independently would have come to a different conclusion."); *Adams v. Louisiana-Pacific Corp.*, 284 F.Supp.2d 331, 342 (W.D.N.C. 2003) ("[W]here a fiduciary has provided a reasonable interpretation of the disputed provisions of a plan, this Court may not replace it with its own interpretation."). The Plan Administrator met this burden. The Plan gave the Plan Administrator broad leeway to fashion a methodology in order to meet the Plan's purposes and goals. Under the abuse of discretion standard of review, the Court finds the Plan Administrator's decision was properly supported. Therefore, the Defendant is entitled to judgment.

AND IT IS SO ORDERED.

G. ROSS ANDERSON, JR.
UNITED STATES DISTRICT JUDGE

February ___3___, 2006.

Anderson, South Carolina